UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SETH CAMERON VIRGIL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-01488-SEB-MJD |
| | ) | |
| EQUIFAX INFORMATION SERVICES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Seth Cameron Virgil ("Mr. Virgil") brought this action against Defendant Equifax Information Services, LLC ("Equifax") alleging violations of the Fair Credit Reporting Act (the "FCRA"), 15 U.S.C. § 1681 *et seq.* Now before the Court is Equifax's Motion for Summary Judgment. Dkt. 45. For the reasons discussed below, that motion is **GRANTED in part** and **DENIED in part**.

**LEGAL STANDARD**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit," and a dispute of material fact is genuine when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As the "put up or shut up" moment in a litigation, summary judgment requires parties to "show what evidence [they] ha[ve] that would convince the trier of fact to accept [their] version

1

of events" and to find in their favor on any disputed elements. *Steen v. Meyers*, 486 F.3d 1017, 1022 (7th Cir. 2007). "The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citing *Anderson,* 477 U.S. at 249–50). When deciding whether a genuine dispute of material fact exists, the court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572 (7th Cir. 2021).

## BACKGROUND

The underlying facts relate to the reported theft and subsequent use of Mr. Virgil's personal identifying information ("PII"). Before turning to our recitation of the undisputed material facts, we first address Mr. Virgil's statement of disputed material facts, which consists almost entirely of factual assertions that are not supported by record citations, dkt. 48 ¶¶ 8, 13, 39–40; or are accompanied by citations to materials that we have been unable to locate in the record before us, *id.* ¶¶ 9–12, 14–38, 41–57. *Compare id.* ¶¶ 9, 15, 17, 20–21, 23–24 (citing to Exhibits 2–8), *with* dkt. 48-1 (sole exhibit appended to Mr. Virgil's summary judgment response brief). Insofar as Mr. Virgil's factual assertions lack citations "to particular parts of materials in the record," as Federal Rule of Civil Procedure 56 requires, we have omitted them from our summary below. Fed. R. Civ. P. 56(c)(1)(A).

In its opening summary judgment brief, Equifax requests that we exclude from the record certain documents that "were produced after the close of discovery." Dkt. 46 at 17 n.5. The discovery deadline in this action was August 2, 2024. Dkt. 18 at 5. Mr. Virgil's

counsel, however, delivered supplementary documents to opposing counsel on August 3, 2024, at 12:02 a.m. Dkt. 47-14. Because it is unclear whether Mr. Virgil's untimely documents were included in the record and/or relied upon by Mr. Virgil, we do not resolve Equifax's objection at this time.

## I.    Equifax's Policies & Procedures

Equifax, a credit reporting agency, collects and assembles consumer information into credit files on behalf of more than 200 million consumers in the United States. Munson Decl. ¶¶ 4–5, dkt. 47-1 (Declaration of Equifax's Legal Support Lead Latonya Munson). We outline below Equifax's policies and procedures that are relevant to the case at bar.

### A.    Furnishing Consumer Reports to Third Parties

Upon request from its customers, also referred to as "subscribers," Equifax prepares and furnishes consumer reports, which Equifax's subscribers generally utilize to assess consumers' "potential credit risk." *Id.* ¶ 6. Before Equifax furnishes consumer data, new subscribers must undergo a certification process, whereby they certify the purpose(s) for which the consumer information is sought and verify that the information will be used for no other purpose(s). *Id.* ¶ 38. According to Equifax, it also follows "a verification process through which it makes a reasonable effort to verify" the prospective user's identity as well as the claimed purposes for which consumer data is requested, though Equifax does not detail these procedures further. *Id.*

### B.    Data Collection Policies

Equifax gathers consumer information from so-called "data furnishers"—such as banks, collection agencies, and court records—that are deemed "reliable" based on

3

Equifax's review of the source's reputation as well as Equifax's "longstanding business re-

lationship." *Id.* ¶¶ 5, 8.[1] Data furnishers must also agree to the terms of Equifax's standard

"subscriber agreements," according to which they must abide by "all applicable federal,

state and local laws, including the FCRA . . . , prepare and furnish consumer information

in a proper format, and notify Equifax promptly upon learning that information supplied is

inaccurate or incomplete." *Id.* ¶ 10. Three data furnishers relevant to this case—Hunter

Warfield, National Credit Services, and Columbia Debt Recovery—have each executed

such subscriber agreements with Equifax. *Id.* ¶¶ 9–10.

## C.    Reinvestigation Procedure

Consumers can dispute the accuracy of information reported in their credit files by

contacting Equifax through telephone, mail, or Equifax's webpage. *Id.* ¶ 13. Upon receipt

of notice of a dispute, Equifax locates the consumer's credit file and opens a "CCMS case"

to track ongoing progress in the reinvestigation. *Id.* ¶ 14. Thereafter, Equifax reviews "all

relevant information," which includes any supporting documentation submitted by the con-

sumer as well as the existing contents of the consumer's credit file. *Id.* ¶ 15. If and when

Equifax can verify and resolve the dispute based on the consumer's submissions, it updates

the consumer's credit file accordingly. *Id.* ¶ 16.

Equifax automatically suppresses disputed information associated with identity

theft so long as the consumer submits a police report, a Federal Trade Commission Identity

---

[1] Equifax also asserts that it "regularly conducts computerized quality checks before adding infor-
mation from a data furnisher to its consumer database." Dkt. 46 at 12–13. However, the cited ma-
terial does not support this assertion. *See* Munson Decl. ¶ 8, dkt. 47-1.

Theft Report, or a qualifying "identity theft report," *id.* ¶¶ 36–37, which the FCRA defines as "a copy of an official, valid report filed by a consumer with an appropriate Federal, State, or local law enforcement agency." 15 U.S.C § 1681a(q)(4). Insofar as further investigation is necessary to resolve a consumer's dispute, Equifax uses the standardized procedure through e-OSCAR to electronically transmit an automated consumer dispute verification ("ACDV") form to the data furnisher (wherefrom the disputed information originated), notifying it of the consumer's dispute and providing the documentation submitted by the consumer. Munson Decl. ¶¶ 19–20, dkt. 47-1.

When data furnishers receive a dispute from Equifax, they are generally required, both by contract and by the FCRA, to conduct their own investigation and to report the results back to Equifax. *Id.* ¶ 22. Thereafter, Equifax will delete, update, or modify the consumer's information, as directed by the data furnisher. *Id.* ¶ 23. When the reinvestigation process is complete, Equifax sends the results to the consumer along with a summary of the consumer's FCRA rights, an outline of additional steps (should the consumer be dissatisfied with the resolution), and a description of Equifax's reinvestigation procedures, if requested by the consumer. *Id.* ¶ 24.

## II.    Mr. Virgil's Compromised Data & Equifax Credit Reports

Mr. Virgil currently lives in Indianapolis, Indiana, at The Whit apartment complex, which has been his sole residence since March 2022. Virgil Decl. 2, dkt. 48-1.[2] In October 2022, Mr. Virgil began receiving debt collection communications from Hunter Warfield

---

[2] Equifax notes that Mr. Virgil's Declaration bears a post-discovery date of September 18, 2024, but does not ask us to exclude the Declaration on that basis. Dkt. 51 at 11.

and Fair Collections Outsourcing, and, soon thereafter, Mr. Virgil discovered that more than a dozen past-due apartment debts were affiliated with his name. *Id.*

On November 7, 2022, Mr. Virgil prepared a Federal Trade Commission Affidavit attesting that he was a victim of identity theft and disclaiming the apartment debts, which affidavit he submitted to Hunter Warfield and Fair Collections Outsourcing. Soon thereafter, Fair Collections Outsourcing closed and disaffiliated the debts associated with Mr. Virgil. Hunter Warfield, however, maintained approximately thirteen debt collection accounts under Mr. Virgil's name, including one on behalf of Crystal Square Apartments in Arlington, Virginia, and another on behalf of Haden in McLean, Virginia. *Id.* at 2–3.

On December 8, 2022, Mr. Virgil accessed his Equifax credit report, which revealed that Equifax had furnished Mr. Virgil's credit information to three tenant screening companies—identified as LeasingDesk, RentGrow, and SafeRent Solutions (hereinafter, the "Tenant Screeners")—on fifty-three separate occasions within a six-month period from April through October 2022. *Id.* at 3. In requesting (and obtaining) Mr. Virgil's credit information from Equifax, the Tenant Screeners produced Mr. Virgil's PII, which evidently derived from falsified apartment applications bearing Mr. Virgil's first and last name, social security number, date of birth, and an incomplete prior address to a Chicago apartment that he had leased until 2016. *Id.* at 2–3. According to Mr. Virgil, Equifax furnished his credit data to the Tenant Screeners despite the obvious discrepancy between Mr. Virgil's known Indianapolis address (at The Whit) and the inaccurate Chicago address included in the falsified apartment applications.

On December 29, 2022, Mr. Virgil again requested his Equifax credit report and discovered that Equifax had been misreporting a previous Indianapolis apartment as his current address. *Id.* at 3. Approximately two months later, on February 02, 2023, Mr. Virgil requested a third Equifax credit report, which reflected an Alexandria, Virginia, address unfamiliar to Mr. Virgil as well as two debt collection accounts with Hunter Warfield and National Credit Systems, respectively. *Id.* Shortly thereafter, Mr. Virgil engaged legal counsel to address these "ongoing identity theft implications," which, to him, "seemed to in large part originate from Equifax disclosing [his] credit report information to [the Tenant Screeners] without [his] authorization to apartments' [sic] that had been processing falsified lease applications under [his] name." *Id.*

## III.    Mr. Virgil's Dispute & Equifax's Reinvestigation

On March 6, 2023, Mr. Virgil filed a dispute with Equifax, wherein he stated that he is "a victim of identity theft" and requested the following information be removed from his credit file: fifty-three "soft-labeled inquiries";[3] an Alexandria, Virginia, address; and one Hunter Warfield, one National Credit Services, and two Columbia Debt Recovery d/b/a Genesis ("Genesis") collection accounts, each of which was affiliated with unpaid apartment debts in his name. Dkt. 47-3 at 5. (Mr. Virgil avers that the Genesis accounts were "duplicate[s]" of each other, dkt. 48 ¶ 24, though we cannot discern, based on the parties'

---

[3] According to Equifax, "soft inquiries" occur when "Equifax, the consumer, or a third party views a consumer's Equifax credit report . . . for reasons other than [determining] whether to extend credit." Munson Decl. ¶ 37, dkt. 47-1. A soft inquiry "may be made," for instance, "from companies making promotional offers of credit, periodic account reviews by an existing creditor, or a consumer's own request to check his or her credit file. Soft inquiries have no impact on a consumer's credit rating or credit score." *Id.*

presentations, the veracity or relevance of this assertion.) Mr. Virgil's dispute included the following submissions: a notarized "Identity Theft Victim's Complaint and Affidavit," a photocopy of his driver's license, a declaration of his insurance policy with State Farm Fire and Casualty Company, a copy of his apartment lease agreement with The Whit, various redacted e-mail correspondences with apartment complexes, and screenshots of his credit files with other credit reporting agencies. *See* dkt. 47-3.

As Equifax initiated a reinvestigation based on the dispute filed by Mr. Virgil, it was independently alerted through a fraud block notification from Trans Union that the Hunter Warfield and National Credit Services accounts were affiliated with identity theft, and, on March 11, 2023, Equifax removed both accounts from Mr. Virgil's credit profile accordingly. Munson Decl. ¶ 34, dkt. 47-1; dkt. 47-4 (fraud block notification). Based on Equifax's determination that Mr. Virgil's notarized identity theft complaint (and accompanying submissions) did not constitute an "identity theft report," as defined in Equifax's policies and the FCRA, Equifax did not update or suppress information about the Genesis collection accounts. *Id.* ¶¶ 36–37. Additionally, Mr. Virgil failed to identify the Genesis account numbers, further hindering Equifax's ability to review the dispute. *Id.*; dkt. 47-3 at 5.

On March 12, 2023, Equifax received two "fraud complaint referrals" from Experian: one indicating a dispute as to a Dallas, Texas, address appearing on Mr. Virgil's credit profile; and a second indicating that a Genesis account ending in 7368 was affiliated with identity theft in Mr. Virgil's name. Munson Decl. ¶ 35, dkt. 47-1; dkt. 47-5. On March 13, 2023, Equifax contacted Genesis through the ACDV system regarding the collections

account ending in 7368, which, at the time, reflected a $14,661 debt originating from a defaulted lease with Abbotts Run Apartments Homes (hereinafter referred to as the "Genesis/Abbotts Run" debt). Dkt. 47-7 at 2. Equifax included with the ACDV Mr. Virgil's dispute submissions as well as the following dispute code: "CLAIMS TRUE IDENTITY FRAUD – ACCOUNT FRAUDULENTLY OPENED INITIATE INVESTIGATION." Dkt. 47-7 at 2. The next day, on March 14, 2023, Genesis verified the Genesis/Abbotts Run account "as reported." *Id.*; *e.g.*, Munson Decl. ¶ 36, dkt. 47-1.

Several days later, on March 16, 2023—this time "as a result of the fraud referral it received from Experian," Munson Decl. ¶ 35, dkt. 47-1—Equifax forwarded another ACDV to Genesis, which again included Mr. Virgil's submissions and an identity-theft dispute code. Dkt. 47-6 at 2. On March 21, 2023, Genesis verified the information. *Id.*; Munson Decl. ¶ 35, dkt. 47-1. Thereafter, on March 28, 2023, Equifax deleted the Dallas, Texas, address from Mr. Virgil's profile. Munson Decl. ¶ 35, dkt. 47-1.

On March 25, 2023, Equifax sent its reinvestigation results to Mr. Virgil, notifying him that more than two dozen (unspecified) "disputed items" were "not currently reporting on his Equifax credit file; that the disputed address(es) had been deleted; and that Genesis had verified the Genesis/Abbotts Run debt. Dkt. 47-8 at 4–6.

## IV.    Subsequent Equifax Credit Reports

Mr. Virgil's Declaration reflects that, throughout 2023 and 2024, Mr. Virgil continued to monitor developments relating to his credit status. *See* Virgil Decl. 4–5, dkt. 48-1. We summarize those efforts below.

On May 20, 2023, Mr. Virgil requested and reviewed his Equifax credit report, which he maintains displayed the "wrongly verified" Genesis/Abbotts Run collection account. *Id.* at 4. In early June 2023, Mr. Virgil, through his legal counsel, contacted Equifax about the ongoing inaccuracies in his credit report. *Id.*

One month later, on June 21, 2023, Mr. Virgil obtained a copy of his Equifax credit report, which showed "double reporting" of the Genesis/Abbots Run debt as well as a "fraud-related Woodland" apartments debt. The following day, Mr. Virgil's attorney contacted Equifax again. *Id.*

From August 2, 2023, through December 18, 2023, Mr. Virgil's Equifax credit report no longer included information regarding any apartment-related collections accounts. *Id.* During this period, Mr. Virgil's Equifax credit score was 829. *Id.*

On March 6, 2024, Mr. Virgil discovered that his Equifax credit report reflected a new $12,000 collections debt with Genesis, this time originating from a delinquent lease with Ravens Crest apartments in Manassas, Virginia (hereinafter referred to as the "Genesis/Ravens Crest" debt). *Id.* Mr. Virgil's attorney promptly contacted Equifax to dispute the Genesis/Ravens Crest debt as well as the Tenant Screeners' soft inquiries, which (allegedly) still appeared on Mr. Virgil's credit report. *Id.* at 4–5. When Mr. Virgil reviewed his Equifax credit report on May 2, 2024, however, the Genesis/Ravens Crest collection account, the related Manassas, Virginia, address, and the numerous soft inquiries had not been removed. *Id.* at 5.

On August 26, 2024, Mr. Virgil filed identity theft disputes with Experian and Trans Union challenging the Genesis/Ravens Crest debt and the Manassas, Virginia, address

discrepancy. *Id.* Shortly thereafter, on September 3, 2024, Mr. Virgil discovered that Equifax had removed the Genesis/Ravens Crest debt from his profile, contributing to his improved credit score of 826, though Equifax had continued to report the Manassas, Virginia address. *Id.* On September 7, 2024, Mr. Virgil received a mailed notice from Equifax, wherein Equifax related that he "may have been a victim of fraud or identity theft" and outlined "important information that may be helpful" to him. *Id.*

## V.    Mr. Virgil's Reported Injuries

### A.    Mortgage-Related Injuries

In early January 2023, Mr. Virgil applied for a "prequalification approval" from Bank of America. Virgil Dep. 129:1–2, dkt. 47-9. In a January 4, 2023, email, Mr. Virgil's financial advisor explained to him, "You are able to obtain a prequalification letter from Bank of America to purchase a home. This letter would be based on information contained in your credit report and the income and asset information provided on your application." Dkt. 47-11 at 2. During his deposition, Mr. Virgil could not recall whether he submitted a "formal mortgage application" with Bank of America. Virgil Dep. 126:1–14, dkt. 47-9. In Mr. Virgil's Declaration, however, he states that, on February 1, 2023, he did apply for a pre-approved mortgage with Bank of America. Virgil Decl. 3, dkt. 48-1. Due to "three collective misreported collections accounts" (including "two from Equifax"), Mr. Virgil received "adverse mortgage interest rate terms." *Id.* Mr. Virgil does not detail the nature of the allegedly adverse interest rate terms, however.

In mid-March 2023, after initiating his dispute with Equifax, Mr. Virgil applied for a mortgage with First Centennial Mortgage ("First Centennial"). On March 22, 2023, First

Centennial approved Mr. Virgil for a $719,200 mortgage at a 7.125% interest rate, based on his *Trans Union* credit score of 680. Dkt. 47-10 at 5–6, 10. First Centennial's mortgage loan officer informed Mr. Virgil that, "[i]f the score increased to 750, the interest rate would be 6.625% . . . ." *Id.* at 5. Notably, the electronic correspondence relating to Mr. Virgil's First Centennial loan application reveals references to Trans Union only: There is no reference to Equifax. *See id.* Additionally, Mr. Virgil's deposition testimony reveals that, in March 2023, his Equifax credit score was 738. Virgil Dep. 121:1–7, dkt. 47-9.

### B.    Lost Wages & Financial Losses

Mr. Virgil avers that he suffered "lost commercial brokerage wages from distressed time allocated to credit repair mitigation efforts, as well as expended money . . . navigating the ongoing reporting issues." Compl. ¶ 105, dkt. 1. In Mr. Virgil's "conservative[ ]" estimations, he has suffered approximately $100,000 in lost wages. Virgil Dep. 133:16–17, dkt. 47-9.

In January 2023, after renewing his Indianapolis apartment lease for another "12- or 13-month" term, Mr. Virgil began traveling to Florida in search of a second home. Virgil Dep. 107:7–24, dkt. 47-9. Mr. Virgil claims $15,000 to $25,000 in out-of-pocket expenses resulting from his "driving to Florida, going on property tours," and staying at hotels and/or AirBnBs on three to five separate occasions. *Id.* at 134:14–22. Additionally, in a self-directed effort to improve his credit rating, Mr. Virgil expended approximately $20,000 in "otherwise unneeded payments towards [his] auto loan and one of [his] credit cards." Virgil Decl. 4, dkt. 48-1.

### C.    Emotional Distress

Mr. Virgil alleges that he suffered "distressed energy fruitlessly monitoring and disputing the inaccurate reporting, impending fear of continually perpetuated identity theft harm, and correlated mental and reputational anguish, including embarrassment from adverse credit decisions and externally perceived financial instability." Compl. ¶ 106, dkt. 1. At his deposition, Mr. Virgil generally described that the "serial identity theft . . . has directly affected [his] credit report and [his] day-to-day life" and has been "emotionally taxing." Virgil Dep. 146:15–147:6, dkt. 47-9. Mr. Virgil also claims that his ongoing troubles with Equifax have caused him "los[t] production and efficiency at work" as well as lost sleep. *Id.* Aside from his own testimony, however, Mr. Virgil has not cited any medical notes or other corroborating evidence pertaining to his alleged emotional distress.

## VI.    This Litigation

On August 23, 2023, Mr. Virgil filed this lawsuit against Equifax, asserting that Equifax failed to maintain and follow reasonable procedures to assure the maximum possible accuracy of the information in Mr. Virgil's credit report, in violation of 15 U.S.C. § 1681e(b); failed to conduct a reasonable reinvestigation of disputed information, in violation of 15 U.S.C. § 1681i; and failed to maintain reasonable procedures to limit the furnishing of consumer reports for permissible purposes only, in violation of 15 U.S.C. §§ 1681e(a), 1681b. Compl. ¶¶ 110–33, dkt. 1.[4] Mr. Virgil further avers that Equifax's FCRA

---

[4] Mr. Virgil has since withdrawn his additional claims against Equifax for alleged violations of 15 U.S.C. §§ 1681c-1, 1681c-2, and 1681g. Dkt. 48 at 1 n.1. Accordingly, summary judgment shall be granted in Equifax's favor as to those claims.

violations were "willful," thereby entitling him to statutory or punitive damages. 15 U.S.C. § 1681n.

On October 7, 2024, Equifax moved for summary judgment, arguing that the undisputed material facts do not support Mr. Virgil's claims, thus entitling Equifax to judgment as a matter of law. Dkt. 45. Mr. Virgil filed his response brief on November 4, 2024, dkt. 48, and Equifax filed its reply on November 25, 2024, dkt. 51. Equifax's motion is thus fully briefed and ripe for ruling.

## DISCUSSION

Consumer reporting agencies, such as Equifax, "collect consumer information supplied by furnishers, compile it into consumer reports, and provide those reports to authorized users." *Denan v. Trans Union, LLC*, 959 F.3d 290, 295 (7th Cir. 2020) (citing *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir. 2010)). In performing these tasks, the Fair Credit Reporting Act requires consumer reporting agencies to "follow reasonable procedures to assure maximum possible accuracy of the information" published to consumers' credit reports, 15 U.S.C. § 1681e(b); and, when a consumer disputes "the completeness or accuracy of any item of information contained" therein, to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . ," *id.* § 1681i(a)(1)(A). The FCRA further "prohibits consumer reporting agencies from furnishing a 'consumer report,' except in enumerated circumstances—in other words, when there is a permissible purpose." *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1195 (7th Cir. 2021) (citing 15 U.S.C. § 1681b(a)). Plaintiffs may be entitled to an award of "actual damages,"

14

costs, and attorney's fees for a credit reporting agency's negligent violation of the FCRA, 15 U.S.C. §§ 1681n, 1681o, as well as punitive damages for a willful violation, *id.* § 1681n.

Here, Mr. Virgil contends that Equifax furnished his credit report to the Tenant Screeners, despite obvious factual discrepancies between his actual address and the incorrect address provided in the apartment inquiries, which enabled dozens of fraudulent apartment leases to be obtained and eventually turned over to collections as debts in Mr. Virgil's name. Mr. Virgil also challenges Equifax's reinvestigation, which he alleges was inadequate based on Equifax's failure to remove the disputed Genesis account(s) from his credit profile. We address Mr. Virgil's statutory claims below.

## I.    Section 1681e(a): Furnishing Consumer Reports for Permissible Purposes

Section 1681e(a) provides that all consumer reporting agencies "shall maintain reasonable procedures designed . . . to limit the furnishing of consumer reports to the purposes" enumerated in § 1681b of the FCRA. 15 U.S.C. § 1681e(a). "These procedures shall require that prospective users of the information identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose." *Id.* "No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for" a permissible purpose. *Id.* One such "permissible purpose," as invoked (in passing) by Equifax here, provides that consumer reporting agencies "may furnish a consumer report . . . [t]o a person which" they have "reason to believe . . . intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the . . . collection of an account[ ] of the consumer . . . ." 15

15

U.S.C. § 1681b(a)(3)(A); *see also id.* § 1681b(c)(2) (outlining limitations on information furnished in connection with credit or insurance transaction that is not initiated by the consumer).

In seeking summary judgment on Mr. Virgil's §§ 1681e(a) and 1681b claims, Equifax maintains that it "complied with its obligation to verify that a credit pull is made for a permissible purpose . . . ." Dkt. 46 at 31. In support of its position, Equifax relies exclusively upon Ms. Munson's Declaration, wherein she states that Equifax's policies require "new subscribers to certify the purposes for which such information will be obtained, and certify that the information will be used for no other purpose." Munson Decl. ¶ 38, dkt. 47-1. Prior to furnishing consumer information, Equifax also "verif[ies] the identity of a new prospective user" as well as the asserted purpose(s) for which the subscriber is seeking consumer data. *Id.* Ms. Munson describes Equifax's adherence to these practices with regard to the case at bar as follows:

> Equifax followed these procedures in connection upon [sic] entering its subscriber relationship with [the Tenant Screeners]. As a result of Equifax's thorough procedures of certifying the information sought by [the Tenant Screeners] satisfies [sic] the requirements of the FCRA, Equifax had a permissible purpose for furnishing information to [the Tenant Screeners] relating to each of the "Soft inquiries" on Plaintiff's Equifax credit file between April 13, 2022[,] and October 5, 2022. Further, Equifax did not have any reasonable grounds to believe that information sought by [the Tenant Screeners] would not be used for a permissible purpose.

*Id.* In its reply brief, Equifax also maintains that the Tenant Screeners "routinely screen individuals seeking to apply for apartment housing[ ] and have passed Equifax's verification process," thus demonstrating that Equifax had good reason to accept that Mr. Virgil's consumer data would be used permissibly. dkt. 51 at 10,

16

Although Mr. Virgil alleges that Equifax failed to utilize reasonable procedures to ensure that it furnished his credit report for permissible purposes only, he does not identify which aspects of Equifax's stated certification procedure fell short of its legal obligations under § 1681e(a). He argues, nonetheless, that "the nature, volume, and influx" of apartment-related inquiries from April–October 2022, coupled with the indisputable "address mismatch" (between his current address at The Whit and the partial Chicago address used in the fraudulent apartment applications), demonstrate that "Equifax intentionally disregarded" obvious indications of fraud. Dkt. 48 at 17–18. Mr. Virgil also challenges the factual basis of Equifax's purported "permissible purpose," arguing that he himself "did not authorize any one lease application" and thus was not "involve[ed]" in any credit transaction, as § 1681b(a)(3)(A) requires. *Id.* at 19–20.

Viewing the record in the light most favorable to Mr. Virgil, a reasonable factfinder could conclude that Equifax overlooked the suspicious circumstances of the Tenant Screeners' inquiries, in contravention of its duties under § 1681e(a). As reflected in the record, the Tenant Screeners submitted fifty-three "soft labeled inquiries," seeking Mr. Virgil's credit information on behalf of fifty-three corresponding apartment applications across Virginia and Maryland within a six-month period. Coupled with the fact that the rental applications supplied an improper address—a discrepancy which would have been apparent to Equifax based on Mr. Virgil's known Indianapolis residence—a jury could find "reasonable grounds for believing that [Mr. Virgil's] consumer report w[ould] not be used for" a permissible purpose. 15 U.S.C. § 1681e(a).

17

Additionally, it remains unclear to us whether any permissible purpose under § 1681b was, in fact, established here. Although the parties make passing references to § 1681b(a)(3)(A) in their summary judgment briefs, they have not meaningfully developed their respective legal arguments, nor have they cited to any binding legal authority (beyond the statutes themselves) that establishes the merit of their arguments. Further factual and legal development is therefore necessary before this claim can be conclusively resolved as a matter of law.[5]

## II. Section 1681e(b): Assuring Maximum Possible Accuracy

As noted above, § 1681e(b) requires consumer reporting agencies to "follow reasonable procedures to assure maximum possible accuracy of the information" published to consumers' credit reports. 15 U.S.C. § 1681e(b). Credit reporting agencies are "not automatically liable even if the consumer proves that [they] prepared an inaccurate credit report because the FCRA does not make reporting agencies strictly liable for all inaccuracies." *Sarver v. Experian Info. Sols.*, 390 F. 3d 969, 971 (7th Cir. 2004). Credit reporting agencies are "not liable under the FCRA if [they] "followed reasonable procedures to assure maximum possible accuracy, but nonetheless reported inaccurate information in the consumer's credit report." *Id.* Thus, to establish a violation of § 1681e(b) here, Mr. Virgil must prove that (1) Equifax published an inaccurate consumer report to a third party; (2) Equifax failed to follow reasonable procedures to assure maximum possible accuracy in its reports; and

---

[5] Equifax also asserts, without further elaboration, that "there is no evidence that Plaintiff suffered damages resulting from this FCRA claim." Dkt. 46 at 31–32. In light of the deficiencies noted above, a final determination of damages must also await further development.

(3) Equifax's failure to follow reasonable procedures caused actual damages to him. In moving for summary judgment, Equifax asserts that Mr. Virgil cannot satisfy the second and third elements of his § 1681e(b) claim. Dkt. 46 at 20 & n.6.

### A.    Reasonable Procedures

Section 1681e(b) "does not hold a reporting agency responsible where an item of information, received from a source that it reasonably believes is reputable, turns out to be inaccurate unless the agency receives notice of systemic problems with its procedures." *Sarver*, 390 F.3d at 972 (internal citation omitted). In assessing the reasonableness of a credit reporting agency's procedures, we must "balanc[e] the costs of a marginal return to accuracy against the potential harm to consumers from declining to incur those costs." *Chaitoff v. Experian Info. Sols., Inc.*, 79 F.4th 800, 817 (7th Cir. 2023). "The reasonableness of a reporting agency's procedures is normally a question for trial unless the reasonableness or unreasonableness of the procedures is beyond question." *Sarver*, 390 F.3d at 971. In other words, "summary judgment may be appropriate when a [credit reporting agency] adopted procedures no jury could find unreasonable." *Chaitoff*, 79 F.4th at 816.

Equifax argues that it is entitled to judgment as a matter of law because Mr. Virgil has neither "obtain[ed] any testimony" nor "identified any experts to opine on the reason-ableness of Equifax's procedures," meaning that Mr. Virgil therefore cannot support his § 1681e(b) claim with any evidence. Dkt. 46 at 21. According to Equifax, Ms. Munson's Declaration conclusively establishes the reasonableness of its procedures and shows that it had no reason to question the reliability of data furnished by Hunter Warfield, National

19

Credit Services, or Genesis, based on their known reputations and the fact that each had entered into a subscriber agreement with Equifax. Munson Decl. ¶¶ 9–10, dkt. 47-1.

In opposing summary judgment, Mr. Virgil argues that Equifax's failure to take "reasonable precautions," as § 1681e(b) requires, is evidenced by the inaccurate reporting of "fraudulently derived addresses and fraudulently originated collection accounts." Dkt. 48 at 18. Mr. Virgil maintains that Equifax continued reporting "fraudulently procured" collection accounts, despite "reasonable notice that it was reporting inaccurate information predicated on identity theft." *Id.*

As recounted by Ms. Munson, Equifax collects consumer information from data furnishers deemed "reliable" based on their reputations as well as the nature of their business relationship with Equifax. Munson Decl. ¶ 8, dkt. 47-1. Hunter Warfield, National Credit Services and Columbia Debt Recovery (doing business as Genesis) are three such reliable data furnishers, according to Equifax. The reliability of these data furnishers is bolstered by the fact that they have entered into subscriber agreements with Equifax, according to which they agree to comply with "all applicable federal, state and local laws, including the FCRA . . . , [to] prepare and furnish consumer information in a proper format, and [to] notify Equifax promptly upon learning that information supplied is inaccurate or incomplete." *Id.* ¶ 10. In light of Hunter Warfield's, National Credit Services's, and Genesis's "demonstrated reliability," it was reasonable for Equifax to "trust that [their] original information as complete and accurate." *Chaitoff*, 79 F.4th at 817.

Mr. Virgil, for his part, has adduced no evidence to refute Equifax's stated adherence to its standard procedures, nor has he "proposed an additional measure [Equifax] could

have taken to detect" the inaccuracies he alleges. *Id.* In other words, Mr. Virgil has failed to put forth any arguable basis on which to conclude that Equifax's initial reporting of the collection debts was the result of unreasonable procedures. Absent grounds to question the reasonableness of Equifax's procedures, we conclude that Mr. Virgil's § 1681e(b) claim necessarily fails as a matter of law, and Equifax is entitled to judgment accordingly.[6]

### III.    Section 1681i: Reasonable Reinvestigation

"When a consumer disputes an item in his credit report with a [credit reporting agency]," the agency's "first step is to transmit that dispute to the furnisher." *Chaitoff*, 79 F.4th at 817 (citing 15 U.S.C. § 1681i(a)(2)). "The furnisher then investigates the consumer's dispute and reports its findings" to the credit reporting agency." *Id.* Thereafter, the credit reporting agency "must conduct a 'reasonable reinvestigation' of the dispute." *Id.* (citing 15 U.S.C. § 1681i(a)(1)(A)).

Here, Mr. Virgil challenges the reasonableness of Equifax's reinvestigation of his March 6th dispute. Equifax seeks summary judgment on the grounds that its reinvestigation procedure is reasonable and that Mr. Virgil is unable to establish actual damages.

---

[6] Because Equifax has conclusively established the reasonableness of its procedures for assuring maximum possible accuracy under § 1681e(b), we do not address its additional argument regarding damages with respect to this claim.

## A.    Reinvestigation Procedure

Once "a credit reporting agency . . . has been notified of potentially inaccurate information in a consumer's credit report," it "is in a very different position that one who has no such notice." *Id.* (quoting *Henson v. CSC Credit Servs.*, 29 F.3d 280, 286 (7th Cir. 1994) (citation modified). With the benefit of notice, a credit reporting agency "can target its resources in a more efficient manner and conduct a more thorough investigation." *Id.* (quoting *Henson*, 29 F.3d at 286–87). "Thus, reasonable procedures under § 1681e(b) are not proof of a reasonable reinvestigation under § 1681i(b)." *Id.* "Although the parameters of a reasonable investigation will often depend on the circumstances of a particular dispute, it is clear that a reasonable reinvestigation must mean more than simply . . . making only a cursory investigation into the reliability of the information that is reported to potential creditors." *Id.* at 818 (quoting *Cortez v. Trans Union LLC*, 617 F.3d 688, 713 (3d Cir. 2010)).

In moving for summary judgment, Equifax maintains that it abided by reasonable reinvestigation procedures in addressing Mr. Virgil's March 6th dispute. To support this conclusion, Equifax cites to the uncontroverted fact that the Hunter Warfield and National Credit Services accounts were unilaterally removed from Mr. Virgil's credit file. Equifax also contends that its treatment of the disputed Genesis/Abbotts Run account(s) was reasonable because Mr. Virgil failed to submit a qualifying "identity theft report" that would have otherwise allowed Equifax to automatically delete or block the information; and because Equifax was entitled to rely on Genesis's verification of the information via the ACDV system. Dkt. 46 at 28–29.

Viewing the record in the light most favorable to Mr. Virgil, the non-movant, we conclude that a reasonable jury could find that Equifax's reinvestigation of the Genesis/Abbotts Run debt(s) was unreasonable under the circumstances presented here. There can be no dispute that Mr. Virgil's identity theft allegations, as documented in his March 6th dispute, did not qualify for "automatic suppression" under Equifax's identity-theft policies because no police report had been filed. Nevertheless, a factfinder could regard Equifax's resort to Genesis's barebones ACDV verification as deficient in light of the extensive documentation Mr. Virgil provided in his March 6th dispute, wherein he outlines the nature and scope of the debt liabilities he had incurred by virtue of his reported identity theft. *See Chaitoff*, 79 F.4th at 818–19. Summary judgment is not appropriate in this context.

## B.    Damages Caused by Equifax

In order to prevail on his § 1681i(a) claim, Mr. Virgil "must show that [ ]he suffered damages as a result of the inaccurate information." *Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 608 (7th Cir. 2005) (citation modified). Absent "a causal relation between the violation of the statute and the loss of credit, or some other harm, a plaintiff cannot obtain an award of 'actual damages.' " *Crabill v. Trans Union, LLC*, 259 F.3d 664, 664 (7th Cir. 2001). A "FCRA violation may inflict pecuniary harm, like lost income or out-of-pocket expenses caused by denials of credit, housing, or insurance." *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1194 (7th Cir. 2021). "Nonpecuniary harms, including reputational damage and emotional distress, may also follow [a] FCRA violation, though these harms must be described in 'reasonable detail'—conclusory statements are

23

insufficient." *Id.* "However the plaintiff frames her case, she bears the burden to prove actual damages, whether pecuniary or nonpecuniary." *Id.*

Equifax maintains that Mr. Virgil's FCRA claims fail as a matter of law because he cannot establish that Equifax caused any of his purported damages. Starting with Mr. Virgil's claimed mortgage-related injuries, Equifax contends, and we agree, that Mr. Virgil has failed to demonstrate any causal chain between his alleged mortgage difficulties and Equifax's reporting. Accepting Mr. Virgil's (conflicting) testimony as to whether he did, in fact, apply for a mortgage with Bank of America, *see* Virgil Dep. 126:1–14, dkt. 47-9, his vague statement about having received "adverse mortgage interest rate terms" falls demonstrably short of showing that his *Equifax* credit report was the cause. Mr. Virgil's allegations relating to his mortgage application with First Centennial are equally unavailing, as the record evidence reveals that First Centennial based its assessment on Mr. Virgil's Trans Union credit score only, *see generally* dkt. 47-10; and that Mr. Virgil's Equifax credit score was higher than his Trans Union credit score, Virgil Dep. 121:1–7, dkt. 47-9. We likewise can discern no plausible basis on which Equifax would be held responsible for the roughly $15,000 to $25,000 in costs Mr. Virgil incurred in his Florida housing search.

Mr. Virgil's deposition testimony that he has suffered approximately $100,000 in lost wages, Virgil Dep. 133:16–17, dkt. 47-9, is similarly unavailing due to the lack of evidence revealing how Mr. Virgil reached that calculation. As Equifax highlights, Mr. Virgil suggested during his deposition that he "can produce" the basis for his calculation but, to date, apparently has not done so. *See id.* at 133:18–134:2. Likewise, Mr. Virgil has not elaborated the underlying factual details regarding the approximate $20,000 in (admittedly)

24

unnecessary payments he made toward other outstanding loans, nor has he explained a causal relationship connecting such any expenditure to Equifax's reporting practices. Virgil Decl. 4, dkt. 48-1. It is well established that summary judgment is the "put up or shut up" moment in a case that requires parties to show their evidence. *Steen*, 486 F.3d at 1022. Here, Mr. Virgil's unsubstantiated and in our view clearly exaggerated claims for lost wages and other financial losses therefore do not survive summary judgment.

Lastly, Mr. Virgil has failed to establish any entitlement to emotional damages. Although a plaintiff's testimony may suffice to  support an emotional distress award, the Seventh Circuit requires "more than conclusory statements." *Persinger*, 20 F.4th at 1194. Here, unfortunately for Mr. Virgil, his allegations lack the requisite specificity necessary to demonstrate a legal entitlement to emotional distress damages. For instance, in his deposition, he stated generally that he has experienced ongoing difficulties in his "day-to-day life," which have been "emotionally taxing." Virgil Dep. 146:15–147:6, dkt. 47-9. Mr. Virgil's standalone testimony, without further corroboration, does not meet the "high threshold for proof of emotional distress." *Ruffin-Thompkins*, 422 F.3d at 610.

Because Mr. Virgil has failed to adduce sufficient evidence of his actual damages, Equifax is entitled to judgment as a matter of law as to Mr. Virgil's § 1681i(a) claim based on negligence. *See Persinger*, 20 F.4th at 1194.[7]

## IV.    Punitive Damages

---

[7] The parties do not address the possibility that a "plaintiff may still seek statutory damages if the actual damages caused by the violation are small or difficult to ascertain." *Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724 729 n.5 (7th Cir. 2016).

"Even if a plaintiff cannot prove actual damages, she may still recover statutory or punitive damages by proving that the defendant willfully violated the FCRA." *Id.* at 1194–95 (citations omitted). The term "willfully," as used in § 1681n, means that a defendant violated the FCRA knowingly or with reckless disregard of the law. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 59 (2007). "A willful violation is one committed in 'reckless disregard of [a credit reporting agency's] statutory duty.' " *Chaitoff*, 79 F.4th at 819 (quoting *Burr*, 551 U.S. at 57). "Reckless conduct is that which creates a risk substantially greater than that necessary to render the conduct negligent." *Id.* (citing *Burr*, 551 U.S. at 69). In assessing recklessness, we "also look[ ] to the social utility (or lack thereof) of the conduct at issue." *Id.* (citation modified).

On the record before us, a reasonable jury could not conclude that Equifax "willfully failed to undertake a reasonable reinvestigation" of his March 6th dispute. *Id.* Equifax has demonstrated that it abided by its ordinary procedures for collecting and assessing consumer data and consumer disputes. Moreover, there is no evidence that Equifax wholly ignored Mr. Virgil's dispute: To the contrary, Equifax twice transmitted ACDV notices to Genesis in March 2023, pursuant to its standard reinvestigation procedures. In sum, Mr. Virgil has failed to identify any aspect of Equifax's conduct that constates a "gross deviation from what might be reasonable," and, as such, Equifax is entitled to judgment as a matter of law on Mr. Virgil's willfulness theory of recovery. *Id.*

## CONCLUSION

For the reasons explicated above, Equifax's Motion for Summary Judgment is hereby **GRANTED in part** and **DENIED in part**. Dkt. 45. Equifax's motion is

**GRANTED** as to Mr. Virgil's §§ 1681e(b), 1681i(a), 1681c-1, 1681c-2, and 1681g claims.

Equifax's motion is **DENIED** as to Mr. Virgil's §§ 1681e(a) and 1681b claims.

This case shall proceed accordingly.

IT IS SO ORDERED.

Date:
_____9/30/2025_____

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Jibril Greene
Seyfarth Shaw LLP
jagreene@seyfarth.com

Neil Peluchette
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
npeluchette@taftlaw.com

James Louis Policchio
Jl Policchio Law LLC
james@jlouislaw.com